Ryan Motor Sales, Inc. v. Commissioner.
Ryan Motor Sales, Inc. v. Commissioner
Docket No. 3405-69 SC.
United States Tax Court
T.C. Memo 1970-270; 1970 Tax Ct. Memo LEXIS 88; 29 T.C.M. (CCH) 1190; T.C.M. (RIA) 70270; September 24, 1970, Filed Herbert P. Phillips, 91 Merrimack St., Haverhill, Mass., for the petitioner. David L. Miller, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency in petitioner's Federal income taxes for the years 1965 and 1966 in the amounts of $500.47 and $259.15, respectively. The only issue for decision is whether petitioner is entitled to deduct a loss under section 165 [1] for the demolition of buildings on property subsequently used for the expansion of its automobile franchise. Findings of Fact Some of the facts are stipulated and are found accordingly. Ryan Motor Sales, Inc. (herein called petitioner) is a Massachusetts corporation with *89 its principal place of business at Haverhill, Massachusetts. It keeps accounts on the accrual method and files its tax returns on a calendar year basis. Petitioner filed its 1965 and 1966 Federal corporate income tax returns with the district director of internal revenue at Boston, Massachusetts. Petitioner is a Chrysler franchise which sells both new and used cars. The corporation is wholly owned by Michael T. Ryan, who serves as its president. Michael T. Ryan has operated an automobile business on petitioner's main premises at 5-7 Dudley Street, Haverhill, Massachusetts, since 1952. From at least 1960 until July 1969, petitioner conducted business at two locations; 5-7 Dudley Street and 253 Essex Street, about one mile away. It sold new and used cars at both locations. Dudley Street intersects Main Street in downtown Haverhill. In 1960, the property at 5-7 Dudley Street was separated from Main Street by two residential properties bordering Main Street, thus: 5-7
383 385
Dudley Main St. Main St. Main St.
Street
389 Main St.
Dudley St.
On December 22, 1960, petitioner purchased the property, consisting of land and buildings at 389 Main Street for *90 $12,159.94. On May 14, 1964, petitioner purchased the property, consisting of land and buildings, at 383-5 Main Street for $20,212. The properties at 383, 385, and 389 Main Street were zoned RC residential when petitioner purchased them. In August 1964 an engineering firm completed for petitioner a final drawing of a plan to accompany its request for a zoning variance. On March 25, 1965, petitioner applied for a zoning variance which would permit it to use the Main Street properties for an automobile sales lot. The variance was granted on April 21, 1965, by the City of Haverhill Board of Appeals. The Board noted in its minutes that petitioner lacked adequate space for its business, that the congestion caused traffic and fire hazards, and that under "the present statute petitioner has the right to expand 25% [and] such expansion would encompass most of the proposed area." No opposition to the application was recorded. On October 6, 1965, petitioner contracted to have the buildings on the Main Street properties demolished. After this was accomplished in December 1965, petitioner used the properties as an automobile display lot. The undepreciated cost of the buildings at the time *91 of demolition was $26,308.56. From the time of acquisition until shortly before the buildings were demolished, petitioner received income by renting apartments in the buildings on the Main Street properties. The building at 389 Main Street contained two apartments, while the buildings at 383-5 Main Street contained six apartments. Petitioner collected rent on a weekly basis. One apartment was rented to a new tenant on April 24, 1965. Another apartment stood vacant after August 29, 1964. It was not until July 1, 1965, that petitioner notified the tenants to quit the premises by September 1, 1965. Petitioner received rents from all three Main Street properties in the amount of $1,515 in 1963 (389 Main only), $4,281 in 1964, and $3,724 in 1965. Net profit or loss from rents, excluding depreciation, was $973.86 profit in 1963, $1,125.41 profit in 1964, and $87.80 loss in 1965. Net profit or loss, including depreciation, was $459.51 profit in 1963, $209.16 profit in 1964, and $979.01 loss in 1965. Petitioner had interior painting done for the Main Street properties at a cost of $74.84 in 1963, $545.85 in 1964, and $103.47 in 1965. Petitioner made no other repairs. 1192 In 1962, *92 the Chrysler Corporation had discussed with petitioner the desirability of consolidating its business at one location. In his notice of deficiency respondent allowed a claimed loss of $8,517.36 for demolition of the 389 Main Street building, but disallowed a claimed loss of $17,791.20 for demolition of the 383-5 Main Street buildings. Ultimate Finding At the time petitioner purchased the property at 383-5 Main Street it did so with the intent to demolish the buildings located thereon and to use the property to expand its automobile business. Opinion The only issue before us is whether petitioner is entitled to a demolition loss deduction for the buildings at 383-5 Main Street. The law is well settled. A taxpayer who buys real property and later decides to demolish the building on it may be entitled to a demolition loss. A taxpayer who buys real property intending to demolish the building on it cannot claim a loss. Section 1.165-3, Income Tax Regs. In the latter situation the taxpayer wants, and pays for, only the land, and the purchase price is allocable entirely to the land. The question of intent is one of fact, Montgomery Co. v. Commissioner, 330 F. 2d 950 *93 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court, and the burden of establishing the deductibility of the claimed demolition loss is on the petitioner. Based upon all the relevant facts and circumstances present in this case, we have concluded and found as an ultimate fact that petitioner purchased the property at 383-5 Main Street with the intention of demolishing the buildings thereon and using the property to expand its automobile business. [2] Compare Liberty Baking Co. v. Heiner, 37 F. 2d 703 (C.A. 3, 1930). It is significant that by purchasing the properties at 389 and 383-5 Main Street petitioner could gain frontage on Main Street for its automobile business. The 383-5 Main Street property completed the assembly of a rectangular tract of land at the corner of Main and Dudley Streets. This was in a far more desirable location for an automobile business than the original property at 5-7 Dudley Street. In addition, petitioner and the Chrysler Corporation had discussed in 1962 the desirability of consolidating petitioner's business at one location. Acquisition of the Main Street properties was consistent with this purpose, and in fact the Essex Street location *94 is no longer in use. The fact that petitioner waited for 10 months after purchase to apply for a zoning variance does not detract from our conclusion. Certainly some planning went into its decision to demolish the buildings. Nor is it crucial that the purchase was not conditioned upon obtaining the variance. According to the minutes of the Board of Appeals, petitioner had a legal right to expand its business by 25 percent, which "would encompass most of the proposed area." The expansion of a commercial use on Main Street was not a proposal so unusual that it would be likely to arouse heated opposition. In fact no opposition was recorded. The rental of the 383-5 Main Street property does not necessarily indicate a lack of intent to demolish the building. Barrow Mfg. Co. v. Commissioner, 294 F. 2d 79 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court [Dec. 24,080(M)]; cf. section 1.165-3(a)(2), Income Tax Regs.[3] It would be only logical to rent the property, if possible, until petitioner was ready to proceed. *95 Michael Ryan, petitioner's president and sole shareholder, testified that petitioner bought the property as an investment, and to protect itself from the complaints and harassment of residential neighbors. Mr. Ryan did not elaborate about the complaints and harassment, but we note that demolition would be an effective way of eliminating those problems. As an income-producing investment the Main Street property was less than ideal. From an investment of over $20,000 (there is no evidence of a mortgage) even the cash flow must have been much less than $1,000 in 1964. For all properties it was $1,125.41 in 1964, and the 389 Main Street property accounted for $973.86 in 1963. Repairs of $724.16 in three years do not indicate any long-term commitment to apartment rental. It is of course possible that the property was rapidly 1193 appreciating, but we have no evidence of this. The inference we draw from the over-all facts is that petitioner invested in the property in order to expend its automobile business. Petitioner has pointed out that respondent allowed the demolition loss for the 389 Main Street property, and insists that the 383-5 Main Street property should be treated consistently. *96 We can only speculate about respondent's motivation in treating the properties differently. Perhaps he was deterred from litigation by the longer holding period, or by the fact that the discussions with the Chrysler Corporation occurred after purchase. In any event, we find it of no consequence because we are not bound to treat the 383-5 Main Street property in the same fashion. On this record we hold that no demolition loss deduction is allowable on the 383-5 Main Street property. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. In reaching this conclusion we have considered the pertinent factors listed in section 1.165-3(c), Income Tax Regs.↩
3. Neither party has raised the possible applicability of section 1.165-3(a)(2)↩. We assume, since it would have only a small effect upon the computations, that the omission was deliberate.